Karis and another, Plaintiffs and Respondents, v. Kroger Company, Defendant and Appellant: Mid-City Center, Inc., Impleaded Defendant.

*January 4—February 2, 1965.*

For the appellant there were briefs by *Petersen, Suther-land, Axley & Brynelson,* and oral argument by *Eugene O. Gehl,* all of Madison.

For the respondents there was a brief and oral argument by *Edward Rudolph* of Milwaukee.

CURRIE, C. J. This appeal presents these issues:

(1) Is there credible evidence in the record to support the jury's finding that defendant Kroger was causally negligent with respect to maintaining the doorway area as safe as the nature of the place would reasonably permit?

(2) Was plaintiff's causal negligence as a matter of law at least equal to, or in excess of, that of defendant Kroger?

(3) Are the damages found by the jury excessive?

Plaintiff Theodore Karis attempts to raise an issue with respect to the denial to him of any damages for loss of society, companionship, and services of his wife. However, since he failed to serve and file any timely notice for review upon Kroger as required by sec. 274.12 (1), Stats.,[1] he is precluded from now raising such issue.

---

[1] This statute provides:

"A respondent adverse to the appellant upon the latter's appeal may have a review of any rulings prejudicial to him by serving upon the appellant at any time before the case is set for hearing in

### Negligence of Kroger.

In order to pass upon the issue of whether there is any credible evidence to sustain the jury's finding of causal negligence on the part of Kroger it is necessary to review the material evidence bearing on this issue.

Customers of Kroger's supermarket enter and exit through a pair of glass doors set side by side. The door through which the customer enters swings inward, while that through which he exits swings outward. Each door is opened by an automatic mechanism which is activated by the customer stepping upon a rubber mat as the customer approaches the door. Such mat thus serves as a treadle. The entrance door is to the customer's right as he faces the door from the outside. Likewise the exit door is to the customer's right when he faces this pair of doors from the inside. A metal railing extending at right angles to the closed doors divides the area leading to the doors both on the inside and on the outside. The inner side of the exit door is plainly marked with a sign reading "IN" with the word "only" in smaller letters below it, while the exit door is also plainly marked with a sign reading "OUT" with the word "only" in smaller letters below it.

The "In" door is also equipped with a safety mechanism which seeks to prevent the very accident which occurred in this instance, viz., the door striking a customer who mistakenly seeks to leave the store by the wrong doorway. This safety mechanism is activated by a person stepping on the rubber mat on the inside of the door. When the safety mechanism is working properly and one steps on the inside mat the door remains closed even though someone else then steps on the outside mat of the "In" door. However, if a person on the outside of the door has first activated the

the supreme court a notice stating in what respect he asks for a reversal or modification of the judgment or order or portion thereof appealed from."

opening mechanism so that the door has started to open, the safety mechanism underlying the inside mat cannot thereafter be activated so as to interfere with the continued opening of the door. An architect testified as an expert witness that the automatic doors of the type installed in this supermarket are in common use in the Milwaukee community and in food stores generally. This testimony is undisputed.

Jane Karis testified as follows: She arrived at the store on the day of the accident about 7 p. m., while it was still daylight and was accompanied by her ten-year-old daughter. She first made some purchases and checked out and handed the bag of groceries to the daughter. Mrs. Karis then went to the cashier's window, which is situated to the left of the "In" door and is separated therefrom by a metal railing, to cash a check. She had to wait a minute or two because there were some people at the window ahead of her. After cashing her check she stepped aside so another person could come up to the window, counted her money, and turned to leave. She was opening her wallet when she told her daughter to come along. She took two steps toward the mat and then stepped onto the right corner of the mat. She estimated that half of her foot was on this mat when she made this first step onto it. She does not believe her other foot touched the mat before the door struck her on the forehead. The door had been opened as the result of a man stepping onto the outside mat, although she had not seen him at the time she had stepped on the inside door mat.

This accident happened on Saturday. The following Monday plaintiff Theodore Karis together with an attorney went to the store to check on the operation of the door and there performed an experiment to check on the automatic safety feature of the "In" door. In performing this experiment one of them attempted to activate the mat on the outside of the door while the other stood on the inside mat which acti-

vates the safety mechanism. They testified that the safety mechanism operated when one placed his entire foot anywhere on the inside mat, but did not operate when one stepped on the edge of the mat so as to have the foot only partly on the mat. The attorney testified that when his foot was five to six inches onto the edge of the mat the door would open.

Supervisory employees of Kroger testified with respect to the inspection which Kroger had made prior to the accident of the door mechanisms. Such inspection was done each morning by having one person walk through both the "In" and "Out" doors. The only way the safety mechanism of the "In" door could be tested would require inspection by a team of two persons, one of whom would step on different places on the inner mat or treadle of the "In" door while the other would step on the outer mat or treadle. Mahlandt, the store comanager, testified that the safety mechanism should have worked "no matter where you stood" on the inner mat. It was admitted that no inspection by a team of two persons was performed during the month or two preceding the accident. Kroger adduced no evidence as to why on the day of the accident, and also two days later, the safety mechanism did not function when a person stepped on the outer five or six inches of the mat.

Conceivably the failure of the safety mechanism to operate when a person stepped only on the outer five or six inches of the mat could be due either to a defect in original construction or to a malfunction arising during the course of operation. The verdict of the jury, however, in finding no negligence on the part of the landlord Mid-City, is only consistent with the theory that this safety mechanism was not defective when originally installed by Mid-City, but became defective during the course of operation. Under the lease between Kroger and Mid-City the duty of original in-

stallation was upon Mid-City, but the lease imposed no duty upon it to keep this part of the premises in repair.[2]

Kroger bases its contention, that the evidence does not support the finding of causal negligence against it, on the lack of any evidence as to when the safety mechanism first failed to properly function. It particularly relies upon *Pettric v. Gridley Dairy Co.* (1930), 202 Wis. 289, 232 N. W. 595, and *Boutin v. Cardinal Theatre* (1954), 267 Wis. 199, 64 N. W. (2d) 848, and quotes this extract from the opinion in the latter case (p. 204) :

"In *Pettric v. Gridley Dairy Co., supra,* we held that the statute does not make an owner or employer the insurer of the safety of the frequenter and his duty to repair or maintain does not arise until he has at least constructive notice of the defect. To have notice of a defect, of course the defect must exist and, in order to impose liability, it must exist for so long a time that the party charged with responsibility by the safe-place statute has opportunity not only to discover it but to remedy the situation and avoid the accident."

In the instant case, unlike in the *Pettric* and *Boutin Cases,* we are concerned with a safety mechanism which got out of order and failed to function. We have no hesitancy in holding that, in a situation where there is a place of employment to which the safe-place statute applies, a duty is placed upon the employer to make timely and adequate periodic inspections of any safety devices to ascertain whether they are properly functioning. This duty under sec. 101.06, Stats., of course inures to the benefit of frequenters as well as employees. The record here clearly establishes that Kroger failed in this duty. According to its practice, Kroger made an inadequate inspection on the morning of the accident. Under such circumstances we do not consider it is permitting

---

[2] The lease required Mid-City to make exterior repairs including "exterior doors." The "In" and "Out" doors referred to in this opinion were not exterior doors because there was another set of outer doors.

a jury to indulge in unwarrantable speculation in concluding that, if Kroger had made an adequate inspection that morning, it would have discovered the defect. Thus the finding of negligence against Kroger can be sustained on the theory of constructive notice.

### Comparison of Negligence.

Kroger's brief, in advancing the argument that the negligence of Mrs. Karis was at least equal to, or greater, than Kroger's negligence, acknowledges the general principle that it is only in exceptional cases that this court will determine the comparative-negligence issue as a matter of law.

Plaintiff was fully aware of the location, operation, and use of the doors including the specific door involved in the accident. She had used the door on numerous previous occasions. The doors were similar to those which she had used in other stores. She had used the door involved in the accident when she entered the store ten to fifteen minutes before. Plaintiff was an educated, intelligent, mature adult. She could not have known any more than she did to have enabled her to use the proper door and use it in a proper manner. The door was of glass and if she had looked directly at it she should have seen the sign at eye level marking it as the "In" door. She also should have seen the man about to enter the store through this door. The only evidence which tends to explain why she did not make these observations is that she was preoccupied with closing her purse.

On the other hand, Kroger's failure to properly inspect and maintain in good working order the safety mechanism, which the jury was warranted in concluding would have prevented the accident, was also a serious breach of duty upon Kroger's part. While the question of whether we should determine the comparative-negligence finding as a matter of law and find the negligence of Mrs. Karis to have

been at least equal to that of Kroger's is a close one, we conclude that the comparison in this case was for the jury and not the court.

### Are the Damages Excessive?

Kroger attacks the jury's award of $5,000 to Mrs. Karis for her injury as being excessive.

At the time of the accident Mrs. Karis was an attractive young woman twenty-nine years of age. The metal edge of the door struck a vertical blow to her right forehead inflicting a cut just above the eyebrow of nearly an inch in length and a quarter inch deep. Her wound was first dressed at the Milwaukee County Hospital. She was then taken to another hospital where Dr. Casey, a plastic surgeon, operated on her as an outpatient for about forty minutes and then sutured the wound. During the first three weeks following the accident she had severe pain, had difficulty sleeping, and consumed from eight to 10 aspirins per day. The headaches continued for many months, and when severe were accompanied by nausea and vomiting.

In January, 1962, Dr. Docktor, another plastic surgeon, performed another operation on her forehead. This consisted of sanding or abrasing the outer layer of skin from her forehead around the wound scar, so that the skin would grow back evenly and the scar would not be as noticeable. The removed portion of the skin measured about three inches wide and an inch and a half high.

Because she continued to suffer from headaches, she consulted Dr. Schaeffer, a nerve specialist, in June, 1963, and he treated her five times between then and trial in December. He testified that it was his medical opinion Mrs. Karis had suffered a cerebral concussion as well as an injury to the right supraorbital nerve from the accident, and that as a result she was left with symptoms referred to as a post-

concussion syndrome. These symptoms are manifested chiefly by headaches and a feeling of dizziness.

There is also testimony that the area of the dermabrasion performed on the forehead by Dr. Docktor in both cold and hot weather gets redder than the remaining skin area of the forehead. The wound scar which is about one-half inch long has a whiteish color. In winter Mrs. Karis experiences a burning feeling in the wound area and at other times an itching sensation. During the thirty-month period between the accident and date of trial Mrs. Karis consumed five 250-tablet bottles of aspirin because of her headaches.

Our review of the evidence causes us to conclude that while the $5,000 damages awarded by the jury are high, we are not inclined to hold them to be excessive. We are particularly reluctant to disturb a jury's finding of damages for personal injuries as being excessive where, as here, they have received the approval of the trial judge.

*By the Court.*—Judgment affirmed.

HALLOWS, J. (*dissenting*). I dissent on the ground the plaintiff's attempt to exit from an "In" door was at least as negligent as the defendant's failure to make an adequate inspection which would have revealed the five or six-inch strip of the treadle mat did not function.